## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-23189-CV-GAYLES/TORRES

MCM ENTERTAINMENT, INC., *et al.*,

     *Plaintiffs*,

v.

DIAZ WORLD TRADE GROUP, INC., *et al.*,

     *Defendants*.

_____/

## OMNIBUS REPORT AND RECOMMENDATION

Pending before the Court are the parties' motions for partial summary judgment as well as Defendants' motion for leave to amend their counterclaims and affirmative defenses. [D.E. 138, 140, 191]. The motions are fully briefed and therefore ripe for disposition. [D.E. 146, 147, 150, 151, 197, 200]. After careful consideration of the motions and the relevant authority, and otherwise being fully advised in the premises, the Court recommends that (1) Plaintiffs' motion for summary judgment be **GRANTED in part and DENIED in part**, (2) Defendants' motion for summary judgment be **GRANTED in part and DENIED in part**, and (3) Defendants' motion for leave be **DENIED** consistent with the following discussion.[1]

_____

[1]    The Honorable Darrin P. Gayles referred these and other motions to the undersigned for disposition or report and recommendation. [D.E. 118].

# I.   BACKGROUND

This case stems from a sour business relationship that began in 2015. As a result, the parties have thrown the proverbial kitchen sink at one another. Accordingly, both the pleadings and the relevant briefing can be generously described as messy. Therefore, the Court begins by reciting the metes and bounds of this litigation before explaining what claims and defenses have been whittled away through motion practice under Federal Rule of Civil Procedure 12. After that, we discuss whether some of the remaining claims and defenses should survive summary judgment. We then conclude by recommending whether, at this late stage of the case, Defendants should be granted leave to amend their pleadings for a third time.

## Amended Complaint

Plaintiffs MCM Entertainment, Inc. ("MCM"), Maria Claudia Molina ("Ms. Molina"), and Lunamar Wellness Group, LLC ("Lunamar") have alleged 17 claims against Defendants Diaz World Trade Group, Inc. ("DWTG") and/or its principal Marco Diaz ("Mr. Diaz"). *See* [D.E. 73]. Prior to the filing of the instant motions for summary judgment, all of these claims remained pending in this lawsuit. The claims are recited below and, unless otherwise noted, Plaintiffs allege these claims against both Defendants.

COUNT 1:   Trademark Infringement under Federal Law.

COUNT 2:   Unfair Competition under Federal Law.

COUNT 3:   Trademark Dilution under Federal Law.

COUNT 4:   Unfair Competition under Florida Law ("FDUPTA").

2

COUNT 5:        Trademark Dilution under Florida Law.

COUNT 6:        Breach of Contract under Florida Law.

COUNT 7:        Tortious Interference under Florida Law (only against Mr. Diaz).

COUNT 8:        Accounting and Damages under Florida Law.

COUNT 9:        Constructive Trust under Florida Law.

COUNT 10:       Misappropriation of Trade Secrets under Federal Law.

COUNT 11:       Misappropriation of Trade Secrets Under Florida Law.[2]

COUNT 12:       Fraud under Florida Law.

COUNT 13:       Unjust Enrichment under Florida Law.

COUNT 14:       Permanent Injunction under Federal Law.

COUNT 15:       Civil Conspiracy under Florida Law.

COUNT 16:       Tortious Interference under Florida Law (only against Mr. Diaz).

COUNT 17:       Breach of the Covenant of Good Faith and Fair Dealing (only against DWTG)

In addition to challenging Lunamar's standing, Defendants' motion for partial summary judgment attacks Counts 1, 3, 4, 5, 7, 10, 11, 12, 15, and 16. *See* [D.E. 140]. Plaintiffs separately seek summary judgment in their favor on Count 6. *See* [D.E. 138].

---

[2]     There is a typographical error in the amended complaint, which resulted in Count 11 being skipped. See [D.E. 73 at 32]. Accordingly, we treat "Count XII" as "Count 11" and so on.

3

## Amended Counterclaims

The Court dismissed all of Defendants' counterclaims for various reasons. *See* [D.E. 167, 182]. But we did so after the summary judgment motions were filed, and therefore Plaintiffs redundantly attack some of these counterclaims in their summary judgment motion as well. Accordingly, we do not address Plaintiffs' summary judgment arguments relating to Defendants' counterclaims, except where we find such discussion insightful into the merit of Defendants' motion for leave to file amended counterclaims—some of which recycle the following. *Compare* [D.E. 84] *with* [D.E. 191-1]. The currently dismissed counterclaims are recited below.

COUNTERCLAIM 1:   Declaratory Relief under Federal Law.[3]

COUNTERCLAIM 2:   Breach of an Implied Partnership Agreement under Florida Law.[4]

COUNTERCLAIM 3:   Breach of an Implied Joint Venture Agreement under Florida Law.[5]

COUNTERCLAIM 4:   Constructive Trust under Florida Law.

COUNTERCLAIM 5:   Equitable Lien under Florida Law.

COUNTERCLAIM 6:   Unjust Enrichment under Florida Law.[6]

COUNTERCLAIM 7:   Accounting under Florida Law.

---

[3]   Defendants seek leave to refile this as Counterclaim 6. [D.E. 191-1].

[4]   Defendants seek leave to refile this as Counterclaim 1. [D.E. 191-1].

[5]   Defendants seek leave to refile this as Counterclaim 2. [D.E. 191-1].

[6]   Defendants seek leave to refile this as Counterclaim 3. [D.E. 191-1].

COUNTERCLAIM 8: Breach of Fiduciary Duties under Florida Law (only against Ms. Molina).[7]

COUNTERCLAIM 9: Fraud under Florida Law (only against Ms. Molina).[8]

COUNTERCLAIM 10: Trademark Infringement and Unfair Competition under Federal Law.

COUNTERCLAIM 11: Trademark Infringement under Florida Law.

COUNTERCLAIM 12: Common Law Unfair Competition under Florida Law.

COUNTERCLAIM 13: Unfair Competition under Florida Law ("FDUPTA").

COUNTERCLAIM 14: Permanent Injunction under Federal Law.

COUNTERCLAIM 15: Breach of Contract under Florida Law.

Plaintiffs challenge Counterclaims 1, 2, 3, 4, 7, 8, and 9 in their motion for partial summary judgment.  To reiterate, the Court does not address these summary judgment arguments below because the claims have already been dismissed and therefore the procedural posture of the case precludes the Court from entertaining these arguments.  But we nevertheless address some of these counterclaims below because, with respect to the six counterclaims that Defendants are seeking leave to revive, we believe amendment would be futile.

## Affirmative Defenses

Unlike the counterclaims, which have all been dismissed, the fate of Defendants' affirmative defenses is more complicated.  Some of these defenses have already been stricken.  Some of these defenses are subject to Plaintiffs' motion for

---

[7]     Defendants seek leave to refile this as Counterclaim 4.  [D.E. 191-1].

[8]     Defendants seek leave to refile this as Counterclaim 5.  [D.E. 191-1].

summary judgment.  And Defendants separately seek leave to file nearly all these amended affirmative defenses.  *Compare* [D.E. 74] *with* [D.E. 191-2].  The affirmative defenses are recited below with each stricken defense designated as such.  *See* [D.E. 167, 182].

DEFENSE 1:  Common-law trademark claims barred by the existence of the parties' implied partnership or joint venture.[9]

DEFENSE 2:  Ratification regarding Defendants' relationship with New World Nutritionals.[10]

DEFENSE 3:  Ratification regarding alleged contractual breaches.[11]

DEFENSE 4:  Invalid trademark registrations due to the existence of an implied partnership or joint venture.[12]

DEFENSE 5:  Laches.[13]

DEFENSE 6:  Estoppel, acquiescence, waiver, and/or unclean hands.[14]

DEFENSE 7:  Plaintiffs lack ownership of the relevant trademarks due to the existence of an implied partnership or joint venture.[15]

---

[9]   Defendants seek leave to refile this as Affirmative Defense 10.  [D.E. 191-2].

[10]   Defendants seek leave to refile this as Affirmative Defense 4.  [D.E. 191-2].

[11]   Defendants seek leave to refile this as Affirmative Defense 5.  [D.E. 191-2].

[12]   Defendants seek leave to refile this as Affirmative Defense 10.  [D.E. 191-2].

[13]   Defendants seek leave to refile this as Affirmative Defense 6.  [D.E. 191-2].

[14]   Defendants seek leave to refile only "acquiescence" as Affirmative Defense 1. [D.E. 191-2].

[15]   Defendants seek leave to refile this as Affirmative Defense 10.  [D.E. 191-2].

DEFENSE 8:   Defendants are the senior users of "PELAZO" and have superior rights.[16]

DEFENSE 9:   Failure to mitigate damages.[17]

~~DEFENSE 10~~: Defendants actions were justified.

DEFENSE 11: Punitive damages claims are barred by the Lanham Act.[18]

DEFENSE 12: Plaintiffs claims are barred where the relevant trademarks are the common-law trademarks of the parties' implied partnership or joint venture.[19]

DEFENSE 13: Plaintiffs claims are barred because the relevant trademarks do not meet the requisite standard for fame.[20]

DEFENSE 14: Plaintiffs claims are barred because the alleged infringement was innocent.[21]

DEFENSE 15: Plaintiffs trademark registration of "PELAZO" is unenforceable because of a fraud committed on the United States Patent and Trademark Office.[22]

~~DEFENSE 16~~: Plaintiffs claims are barred by the fraudulent application of the marks at issue.[23]

---

[16]   Defendants seek leave to refile this as Affirmative Defense 7.  [D.E. 191-2].

[17]   Defendants seek leave to refile this as Affirmative Defense 8.  [D.E. 191-2].

[18]   Defendants seek leave to refile this as Affirmative Defense 9.  [D.E. 191-2].

[19]   Defendants seek leave to refile this as Affirmative Defense 10.  [D.E. 191-2].

[20]   Defendants seek leave to refile this as Affirmative Defense 11.  [D.E. 191-2].

[21]   Defendants seek leave to refile this as Affirmative Defense 12.  [D.E. 191-2].

[22]   Defendants seek leave to refile this as Affirmative Defense 13.  [D.E. 191-2].

[23]   Defendants seek leave to refile this as Affirmative Defenses 2 and 3, albeit with greater detail.  [D.E. 191-2].

Plaintiffs seek summary judgment on affirmative defenses 1, 2, 3, 4, 5, 6, 7, 8, 10, 12, 14, 15, and 16.  Unless otherwise necessary, we do not discuss the summary judgment arguments that have been mooted through Rule 12 motion practice.

## II.   ANALYSIS

We address Defendants' motion for summary judgment first, concluding that they are entitled to summary judgment on some of Plaintiffs' claims.  We then discuss Plaintiffs' motion for summary judgment and determine that Plaintiffs are entitled to summary judgment on some of Defendants' asserted defenses that have not already been stricken.  Finally, we discuss why Defendants should not be granted leave to amend their defenses and counterclaims at this late stage of the case.

### A.   *Defendants' motion for partial summary judgment.*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).  "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial.  *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies, are 'implausible.'"  *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  In making this determination, the Court must decide which issues are material.  A material fact is one that might affect the outcome of the case.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Ibid.*

### 1.  *Plaintiff Lunamar does not lack standing.*

Defendants' motion for partial summary judgment begins its challenge with a broad brushed attack on the standing of Plaintiff Lunamar.  In doing so, however, it appears that they have erroneously conflated the concept of standing with the prohibition of duplicative recovery.  Defendants' standing argument thus proves to be without merit.

For context into this standing issue, Ms. Molina established a career in the fitness and nutrition business since at least 2007 through television, radio and social media.  She created MCM and Lunamar to commercially exploit her public image by using her name, image and likeness, and her knowledge of fitness and nutrition, in the promotion and marketing of lifestyle goods and services.

MCM owned the trademark CLAUDIA MOLINA, plus a design mark CM, which were and continue to used in connection with her lifestyle brand, including for use in entertainment services, health care products, educational services, physical fitness services, and instructional services.  She first began using her marks in 2007, and she applied, through the entity she controlled MCM, for a trademark registration in "CLAUDIA MOLINA" in 2013.[24]

The parties in this case, specifically MCM and DWTG, entered into written Retail Merchandise License agreements from 2015 through 2019 for the manufacture, distribution and sale of CLAUDIA MOLINA trademarked products. The parties' relationship first soured in 2022 after Ms. Molina discovered that

---

[24]     [D.E. 141 at ¶¶ 7-11].

Defendants had been selling CLAUDIA MOLINA goods outside the permissible use under their distribution agreements.  Plaintiffs learned that Defendants allegedly were taking shapeware that Ms. Molina helped design and sold them under a different brand or no brand at all.  Ms. Molina accused Defendants of trademark infringement and breach of contract, which allegations culminated in the filing of this lawsuit.[25]

Before she discovered this alleged infringement, Ms. Molina created a second entity, Lunamar, in 2020 to also further her product lines.  In 2022, at or near the time she learned of the alleged infringement, MCM assigned the registration of her CLAUDIA MOLINA trademarks to Lunamar.[26]  At the time this lawsuit was filed, Ms. Molina included MCM and Lunamar as party plaintiffs in the suit as creators and assignees of her trademarks.

In their motion, Defendants now argue that, as a result of the 2022 transfers, Lunamar lacks standing to assert trademark infringement claims against them for any injury that accrued prior to the transfer of the registration because the Lanham Act makes infringers liable only to the "registrant" of the trademark at the time of the infringement.  [D.E. 138 at 4-5] (citing, *inter alia*, 15 U.S.C. § 1114(1) and *Heron Dev. Corp. v. Vacation Tours, Inc.*, No. 16-cv-20683, 2017 WL 5957743, at *3 (S.D. Fla. Nov. 30, 2017)).

---

[25]    [D.E. 148 at ¶ 42].

[26]    [D.E. 139 at ¶¶ 17-18]; [D.E. 148 at ¶¶ 17-18].

The problem with Defendants' assignee-lacks-standing argument is that, under the Lanham Act, the term "registrant" encompasses the legal representatives, successors, and "assigns" of the registrant. 15 U.S.C. § 1127. Accordingly, under the plain text of the Lanham Act, Lunamar—as an assignee of the MCM—*does* have standing to pursue trademark infringement claims against Defendants for injuries that accrued prior to the assignment. *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1278-79 (S.D. Fla. 2013) ("Authorities uniformly agree that only the Trademark's registrant (or the registrant's legal representatives, predecessors, successors, and assignee) may sue under § 32(1).") (emphasis omitted and modifications adopted).

So, as long as Plaintiffs have alleged in the operative complaint that Lunamar has an interest in the trademark following an assignment from MCM, as they have here, and for summary judgment purposes supported that allegation with positive proof of the assignment, which they have as well, then a prima facie case for standing has been established under section 1114(a) of the Lanham Act.

And Defendants have raised no challenge to the breadth and scope of the assignment itself. That fully undermines their broader claim that only the owner or registrant of the trademark at the time of infringement has standing to sue under the statute. Defendants thus conclude that only MCM had standing, not Lunamar, because the acts of infringement all took place before 2022 when the assignments became effective. Yet that argument is flawed as well. If an assignment is not limited in time or scope, an assignee can sue for infringement that took place before as well

as after the date of the assignment. *See, e.g., Nutradose Labs, LLC v. Bio Dose Pharma*, 22-CV-20780, 2023 WL 3645405, at *12 (S.D. Fla. May 25, 2023) (denying summary judgment on standing to sue as assignee; "Defendants have not pointed to evidence that calls into question the Trademark Assignment. . . . As such, Plaintiff has standing to sue for trademark infringement prior to December 7, 2021.").[27]

Defendants' contrary caselaw is inapposite because those cases involved assignments that post-dated the filing of an infringement lawsuit, *e.g., Insect Sci. Res., LLC v. Timberline Fisheries Corp.,* No. 1:07-CV-2662-JEC, 2010 U.S. Dist. LEXIS 9934, at *14 (N.D. Ga. Feb. 3, 2010), or involved very different claims and circumstances, *e.g., Sanchez v. Hacienda Records & Recording Studio, Inc.*, CIV.A. H-11-3855, 2015 WL 1219651 (S.D. Tex. Mar. 17, 2015) (also distinguished by Judge Bloom in *Nutradose*).

Therefore, the standing argument fails given the undisputed record of a complete assignment for past and present infringement that pre-dated the filing of the lawsuit. At the same time, however, the law would never allow MCM as creator and assignor of the trademarks, and Lunamar as assignee and current registrant, to both recover for the same injuries twice. *See, e.g., BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1277 (11th Cir. 2008) ("The one-satisfaction rule . . . operates to prevent double recovery, or the overcompensation of a plaintiff for a single

---

[27]    To boot, there is record evidence that undermines Defendants' premise that the only acts of infringement in this record pre-dated the date of the Lunamar assignments. But we need not rely on that issue of fact to deny the motion given the flaw in Defendants' underlying legal reasoning.

injury."). Accordingly, if Defendants are found liable for infringing trademarks that were owned at the time by MCM, Lunamar can recover the damages from that infringement only if MCM forgoes such recovery. In other words, MCM and Lunamar cannot recover damages for the same injury that was suffered before 2022.

But this recovery limitation does not equate to a lack of standing. Insofar as Defendants seek summary judgment on the trademark infringement claims asserted by Lunamar because of a lack of standing, Defendants' motion should be DENIED.

**2.** *Judgment is Due Only on the Section 1114 Infringement Claims.*

Defendants seek summary judgment on all of Plaintiffs' "trademark infringement" claims that are included in Counts I through V of the Amended Complaint. [D.E. 140 at 3]. Defendants use a very broad and faulty brush to target all these counts of the Amended Complaint. When one analyzes their motion in more granular detail, Defendants may prevail on only one aspect of their "trademark infringement" motion with respect to Count I.

The motion first targets Count I of the Amended Complaint by contending that Defendants never created a counterfeit, copy, or colorable imitation of purported marks. Plaintiffs push back on this argument by highlighting its incongruence with their theory of trademark infringement. According to Plaintiffs, their theory of infringement derives from an alleged "reverse passing off" of Plaintiffs' products and therefore Defendants' argument fails because Plaintiffs need not produce evidence regarding Defendants' creation of a counterfeit, copy, or colorable imitation of Plaintiffs' trademarks to successfully prove infringement.

14

To resolve this aspect of the motion, we must first focus on what Count I specifically alleges. The Amended Complaint seeks damages for "infringement of Plaintiffs' trademark registrations in violation of the Lanham Act, 15 U.S.C. § 1114(1)." [D.E. 73 at 18, ¶82]. The acts of infringement that give rise to this claim for damages involve "Defendants' claim of ownership of The Marks" and "representation of ownership of The Marks, and marketing or entry into understandings or agreements with third parties regarding The Marks," all in violation of section 1114. [D.E. 73 at 17-18, ¶¶77, 79].

Significantly, there are no allegations of "reverse palming off" or any wrongful act like it that are present in Count I. In other words, Plaintiff is not alleging that Defendants marketed other products under other brands or marks, which wrongly incorporated Plaintiff's designs and goodwill. To the contrary, the claim focuses on misuse of Plaintiff's "marks" themselves. That is indeed what a claim under section 1114 is all about. Federal trademark protection is centered on the Lanham Act that "secure[s] to the owner of [a] mark the goodwill of his business" and "protect[s] the ability of consumers to distinguish among competing producers." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 774 (1992) (internal quotation marks omitted). The Lanham Act provides for civil liability when "[a]ny person who shall, without the consent of the registrant—use in commerce any reproduction . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion." Lanham Act § 32(1)(a), 15 U.S.C. § 1114(1)(a).

15

And this aspect of the Lanham Act, specifically § 32 of the statute, targets the literal infringement of a trademark or service mark through the "reproduction, counterfeit, copy, or colorable imitation of a registered mark". *E.g., Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1261 (11th Cir. 2017).  For that type of claim, the plaintiff must "show 'enforceable trademark rights in [a] mark or name[.]' Second, it had to prove that [the infringer] "made unauthorized use of [its marks] 'such that consumers were likely to confuse the two.'" *Id.* (citing *Dieter v. B & H Indus. of Southwest Florida, Inc.*, 880 F.2d 322, 326 (11th Cir. 1989) (identifying elements for a § 1114 claim)).

As Judge Jordan explains further in *Savannah*, however, courts often confuse this aspect of the Lanham Act with other provisions that are also designed to protect the intellectual property rights of trademark or service mark holders.  *Id.* ("The Lanham Act provides different types of statutory protection.").  Specifically, "[w]e, like other circuits, often blur the lines between § 1114 claims and § 1125 claims because recovery under both generally turns on the confusion analysis." *Id. See also Ross Bicycles, Inc. v. Cycles USA, Inc.,* 765 F.2d 1502, 1503–04 (11th Cir. 1985) ("The factors relevant to establishing [a likelihood of confusion with respect to false designation of origin under 15 U.S.C. § 1125(a)] are identical to the factors relevant to establishing a likelihood of confusion with respect to trademark infringement under 15 U.S.C. § 1114." (citation omitted)).

But there is an important difference between the two:  "§ 43(a), codified at 15 U.S.C. § 1125(a), protects against 'false designation of origin,' which we have referred

to as 'a federal cause of action for unfair competition.' . . . A claim for infringement under § 1114(1)(a) lies only for federally-registered marks, *while a claim under § 1125(a) is broader and may also be based on unregistered (i.e., common-law) marks.*" *Savannah,* 872 F.3d at 1261 (citations omitted) (emphasis added).  It is technically error, however, for a court to conflate the two types of protections that the statute provides.  *See, e.g., Tana v. Dantanna's*, 611 F.3d 767, 773 n.5 (11th Cir. 2010) (district court erred in analyzing claim under section 32(a) of the Lanham Act, when in fact the claim was brought under section 43(a) of the Lanham Act).

Here, Count I of the amended complaint makes no direct reference to unfair competition or false designation of origin of Defendants' products, precisely because it properly (and only) alleged a literal trademark infringement claim under section 32(a) of the Lanham Act, 15 U.S.C. § 1125(a).  That is in contrast to the broader claims asserted in the "unfair competition" claims found in Count II where they re-allege that Plaintiffs' marks have been infringed in addition to claims that "Defendants have made false or misleading descriptions or statements of fact in commerce, regarding the Plaintiffs' Marks." And the facts incorporated into that Count that are relevant to this claim allege that, in part, "Defendants sold the same and/or similar products under other names and/or brands.  Defendant Diaz concealed that he opened a company by the name of YLIME Enterprises, Inc. on or about September 11, 2018, and worked with a well-known influencer to make sportswear attire similar to the products contemplated by the Main Licensing Agreement, and allowed the products to be marketed to the Hispanic market in the U.S. through this celebrity, who is part

of a famous Latin American entertainment family and thus has access to overlapping potential customers of Plaintiffs. Furthermore, Defendants during the contract for shapewear, sold identical or substantially similar shapewear as that of the Plaintiffs, under the name Sexylocker, a company owned by the Defendants, without Plaintiffs knowledge or consent." [D.E. 73 ¶¶50-52].

Through these broader unfair competition claims, Plaintiffs have certainly alleged a "Reverse passing off" claim, sometimes also called "reverse palming off," that seeks to remedy a producer (like Diaz) misrepresenting someone else's goods or services as his own. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n. 1 (2003). As Justice Scalia explained in *Dastar*, if Pepsi were to fill its Pepsi-branded cans with Coca-Cola then Pepsi would be engaging in reverse passing off—a violation of § 43(a) of the Lanham Act. *Id*. at 32; *see also* 15 U.S.C. § 1125(a). That claim is what the unfair competition claim, founded on section 43(a) of the Lanham Act, set forth in Count II of the Amended Complaint is properly targeting. And, to support that claim, Plaintiffs have produced much other evidence supporting their reverse passing off brand of claim. [D.E. 139 at ¶¶ 19, 21-22]; [D.E. 148 at ¶¶ 19, 21-22] (disputing statement of material facts with evidence that, among other things, Defendants sold Claudia Molina shapewear as "Sexy Locker" branded shapewear).

Plaintiffs, however, have not asserted any section 32(a) claims against the Defendants based on direct misuse of the registered trademarks allege here, i.e. the narrower claim that Count I addresses. At summary judgment, Plaintiffs have the burden of identifying the evidence necessary to support that specific claim, but they

fall back on their reverse palming off theory.  To the extent Plaintiffs wanted to include a reverse palming off theory in Count I, they cannot do so under section 32(a) of the Lanham Act.  Defendants are thus correctly seeking summary judgment on Count I of the Amended Complaint.

Therefore, no genuine dispute of material fact precludes summary judgment at this juncture on Plaintiffs' section 32(a) trademark infringement claim in Count I of the Amended Complaint.  This aspect of Defendants' motion should be GRANTED and judgment should be entered in Defendants' favor on Count I.

The motion, however, was not limited to Count I.  The motion targeted all "trademark infringement" claims in Counts I through V on the theory that "Plaintiffs have neither alleged nor offered proof that Defendants created a copy or imitation of any of their products or 'the Marks.' Plaintiffs cannot, therefore, prove trademark infringement." [D.E. 140 at 8].  But as we explain above, that contention simply ignores the thrust of Plaintiffs' unfair competition claims that seek broader infringement damages based on Defendants' sale and distribution of products that incorporated Plaintiffs' designs and know-how under the cover of brands or marks that Defendants procured with other competitors.  So at least for purposes of Count II, which alleges a broad section 43(a) claim for misuse of Plaintiffs' trademarks and misappropriation of Plaintiffs' designs and products for Defendants' unauthorized purposes, summary judgment is not appropriate.

Specifically, contrary to the broad-brushed contentions in the Motion, the record evidence submitted in opposition to the motion does in fact support a

potentially meritorious claim under the Lanham Act. *See, e.g., Suntree Techs., Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1348 (11th Cir. 2012) (recognizing false designation of origin claim, in the form of reverse palming off claim, is viable under section 1125 and does not require an examination of traditional trademark infringement factors (like strength of similarity of marks) because "[w]e agree with the Sixth Circuit's opinion in *Johnson v. Jones,* 149 F.3d 494 (6th Cir.1998), that where 'the defendant has taken the plaintiff's product and has represented it to be his own work[,]' the first five factors of the likelihood of confusion test are irrelevant."); *Del Monte Fresh Produce Co. v. Dole Monte Fresh Fruit Co.,* 136 F. Supp. 2d 1271, 1284 (S.D. Fla. 2001) (to establish a claim for reverse palming off, the plaintiff must show that: "1) the item at issue originated with the plaintiff; 2) the defendant falsely designated the origin of the work; 3) the false designation was likely to cause consumer confusion; and 4) the plaintiff was harmed by the defendant's false designation."); *Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F. Supp. 2d 1238, 1252 (M.D. Fla. 2002) (denying summary judgment on reverse palming off claim under section 1125 where "factual disputes as to who actually created some of the items contained within the [disputed products.] Moreover, Defendants have failed to produce sufficient evidence that they did not falsely designate the origin of their Clean Genie Products."); *Turner Greenberg Associates, Inc. v. C & C Imports, Inc.*, 320 F. Supp. 2d 1317, 1334 (S.D. Fla. 2004), *aff'd,* 128 F. App'x 755 (11th Cir. 2005) (finding defendant liable for false designation and reverse palming off; "Passing off or palming off can be achieved merely by sending one product in response to an order

for another or other methods that misrepresent the source to the buyer. . . . Passing off or palming off can also be achieved by using the original product as the demonstrator for selling the accused infringer's cheaper imitation. . . . Palming off is clearly found here. The record contains ample evidence that customers who ordered C & C's products received other manufacturers' products without having been asked whether or not they agreed with the switch.").

Defendants argue in their motion that this record evidence and Plaintiffs' allegations are "inconsistent" with Plaintiff's testimony, or contrary to the terms of the contract, but these theories are simply contesting the merits of the claim rather than showing why summary judgment is the proper vehicle to adjudicate them. Defendants' disagreement with the Plaintiffs' evidence does not mean that summary judgment is warranted; it only means that Defendants can present their alternative version of the facts to the trier of fact for resolution.  In the light most favorable to the non-moving parties here, Plaintiffs have certainly presented sufficient evidence of a genuine issue of fact on their reverse palming off theory of unfair competition to get to trial on Count II of the Amended Complaint.

Therefore, with respect to at least Count II of the Amended Complaint, the motion should be DENIED.

### 3.    *Plaintiffs' FDUPTA claim survives summary judgment.*

Plaintiffs and Defendants appear to agree that the resolution of Defendants' foregoing trademark infringement argument necessitates a similar resolution of Plaintiffs' FDUPTA claim because the trademark infringement claims and the

FDUPTA claim are premised on the same set of facts.  [D.E. 140 at 8-9]; [D.E. 147 at 10].  Because we find that Plaintiffs' Lanham Act claim in Count II, for unfair competition and reverse palming off, cannot be resolved through summary judgment, we find that the same holds true for Plaintiffs' FDUPTA claim stated in Count IV of the Amended Complaint.  Accordingly, a genuine dispute of material fact precludes resolution of this aspect of Defendants' motion as well and it should therefore be DENIED.

### 4.   *Defendants are entitled to summary judgment on Plaintiffs' trademark dilution claims.*

Defendants' next attack boils down to a question of whether Ms. Molina's trademarks—including her name—are famous enough to succeed on a trademark dilution claim.  To prevail on a federal trademark dilution claim, which is alleged here in Count III of the Amended Complaint, Plaintiffs must prove that (1) the plaintiff's mark is famous, (2) the defendant used the plaintiff's mark after the mark became famous, (3) the defendant's use was commercial and in commerce, and (4) the defendant's use of the mark has likely caused dilution.  *See* 15 U.S.C. § 1125(c); *Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1356-57 (S.D. Fla. 2012); *see also Florida Int'l Univ. Bd. of Trustees v. Florida Nat. Univ.*, 91 F. Supp. 3d 1265, 1286 (S.D. Fla. 2015) (articulating the substantively identical elements associated with trademark dilution claims under Florida law).  We agree with Defendants that, on the record before us, Plaintiffs have not met their burden to give rise to a genuine issue of fact on the requisite "fame" of Ms. Molina or her associated trademarks.

22

Trademark dilution claims are limited to trademarks that are so famous they have essentially become a household name; something immediately recognized by the general public as being associated with a particular product—Budweiser beer, Camel cigarettes, Buick automobiles, Exxon fuel, Kodak film, Barbie dolls. *See, e.g., Coach Svcs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372-73 (Fed. Cir. 2012); *Michael Caruso and Co., Inc., v. Estefan Enterprises, Inc.*, 994 F. Supp. 1454, 1463 (S.D. Fla. 1998), *aff'd,* 166 F.3d 353 (11th Cir. 1998); *Brain Pharma, LLC*, 858 F. Supp. 2d at 1356-57; *Fla. Int'l Univ.*, 91 F. Supp. 3d at 1286-87; *Juice & Java, Inc., v. Juice & Java Boca, LLC*, No. 14-cv-22078, 2017 WL 11680256, at *5-8 (S.D. Fla. Jan. 17, 2017). Thus, as Congress explained, "Buick aspirin" and "Kodak pianos" are examples of trademark dilution. *Michael Caruso and Co.*, 994 F. Supp. at 1463.

The Lanham Act provides guidance regarding how to determine whether a trademark is sufficiently "famous" to sustain a trademark dilution claim. *See* 15 U.S.C. § 1125(c)(2)(A). A trademark is famous if it is "widely recognized by the general consuming public of the United States" as the designation of source of the goods or services of the trademark's owner. *Id.* Accordingly, courts consider all relevant factors bearing upon the recognition of the trademark, including:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

> (iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id.*

In response to this burden, Plaintiff summarily relies only the fact that Ms. Molina has more than one million followers on social media—a following that, to a considerable extent, has grown out of Ms. Molina's appearances on a Spanish-language television channel. *See* [D.E. 147 at 10].

With all due respect to Ms. Molina, the record before us does not put her on the same level as America's most recognizable brands.  Not even close.  Rather, like the plaintiff in *Juice & Java*, Ms. Molina has failed to muster more than a scintilla of evidence that her name, likeness, and associated marks are sufficiently famous for trademark dilution purposes.  *See Juice & Java, Inc.*, 2017 WL 11680256, at *5-8. Plaintiffs highlight Ms. Molina's social media following but, again like the plaintiff in *Juice & Java*, they cite no authority for the proposition that evidence of one million online followers is sufficient to carry their burden of production on the issue of fame for purposes of a section 1125(c)(2)(A) claim.  *Id.* at *7.

We are instead persuaded that the record demonstrates nothing more than Ms. Molina's "niche fame" among the Spanish-speaking fitness community; however, "niche fame" is not enough to sustain a trademark dilution claim.  *Coach Svcs., Inc.*, 668 F.3d at 1372 ("By using the 'general consuming public' as a benchmark, the TDRA eliminated the possibility of 'niche fame,' which some courts had recognized under the previous version of the statute.") (footnote omitted).

24

Accordingly, as in *Juice & Java*, Plaintiffs have failed to produce evidence from which a reasonable jury could conclude that they have satisfied the "famousness" prong of their trademark dilution claim that is found in Count III of the Amended Complaint. Nor have they provided us with any caselaw in analogous cases that have sustained Plaintiffs' position. Therefore, Defendants' motion for summary judgment on Plaintiffs' trademark dilution claim should be GRANTED.

### 5.   *Defendants are entitled to summary judgment on Plaintiffs' tortious interference claims.*

Defendants next argue that Plaintiffs cannot prove their tortious interference claims because Defendant Marco Diaz is not a third party to the contracts that he is accused of interfering with.[28] This argument has enough merit to put the burden squarely on Plaintiffs' shoulders at this juncture. But Plaintiffs have not met their burden here.

It is undisputed that the contract that Mr. Diaz allegedly interfered with was formed between two entities—MCM and DWTG. The undisputed record also shows that Mr. Diaz is the sole owner and Chief Executive Officer of DWTG. [D.E. 145-1 at 10].

As a general rule, neither a party to a contract nor that party's officers or agents can be held liable for interfering with its own contract as they cannot be

---

[28]    Defendants separately state that the tortious interference claims—Counts VII and XVII—are duplicative and therefore judgment should be entered in their favor. Defendants do not elaborate on this point, and it is not the Court's job to make their argument for them. But it is obvious that Counts VII and XVII relate to different theories of tortious interference. *See* [D.E. 73 at 25-27, 39-40]. So, it is hard to imagine why Defendants view these claims as duplicative. We reject this argument.

deemed "strangers" to the contract. *See M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1338-39 (11th Cir. 2020). That is because anyone who has a beneficial or economic interest, in or control over, that relationship" cannot be a third party to the same relationship. *See, e.g., Nimbus Tech., Inc. v. SunnData Prods., Inc.,* 484 F.3d 1305, 1309 (11th Cir.2007); *Palm Beach Cnty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) ("Under Florida law, a defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed.").

But there is a very narrow exception to this general rule: When an agent acts "solely with ulterior purposes" and in a manner that is "detriment[al]" to his principal's best interest, the agent can be treated as a stranger to the contract and thereby held liable for tortious interference. *See Alexis v. Ventura*, 66 So. 3d 986, 988 (Fla. 3d DCA 2011). Plaintiffs cling to this exception, summarily claiming that there is "ample evidence that Diaz acted in his own personal interest to the detriment of Plaintiffs by interfering in DWTG's contracts with Plaintiffs." [D.E. 147 at 13].

Plaintiffs' argument is unavailing because they fail to cite any of the "ample evidence" that they believe supports the operation of this exception to Florida's "stranger" rule. It is undisputed that Mr. Diaz has an interest in other companies, but we are not aware of any evidence in the record to support the finding that Mr. Diaz's allegedly tortious actions were *solely* motivated by his own self-interest or the

interest of the other companies that he is affiliated with. And seeing as it is Plaintiffs'
burden to specifically cite such evidence for the Court's consideration, their failure to
do so here persuades the Court that Defendants' argument should prevail.

Given the absence of any material evidence that a party's owner and CEO acted
solely with an ulterior purpose and contrary to every interest of his company, the
general rule applies. Diaz, as owner and CEO, *was* DWTG and thus could not have
interfered with his own contract with Plaintiffs. As a matter of law, he could not be
deemed a stranger to the contracts alleged in the claim. A tortious interference claim,
thus, cannot lie given this record. *Cf. Astro Tel, Inc. v. Verizon Florida, LLC*, 979 F.
Supp. 2d 1284, 1301 (M.D. Fla. 2013) (defamation claim does not lie when third party
publication only involves internal corporate communications to corporate executive;
"In such a situation, 'the corporation has no cause of action' for defamation because
'the essential element of publication to a third party is lacking.'") (quoting *Advantage
Personnel Agency, Inc. v. Hicks & Grayson, Inc.,* 447 So. 2d 330, 331 (Fla. 3d DCA
1984)).

Therefore, insofar as Defendants' motion for summary judgment relates to
Plaintiffs' tortious interference claims in Count VII and XVII, the motion should be
GRANTED.

### 6. *Plaintiffs' misappropriation of trade secrets claims survive summary judgment.*

Defendants' next attack is unpersuasive because genuine disputes of material
fact litter the record around Plaintiffs' trade secrets claims set forth in Counts X and
XI. At issue is essentially whether Defendants' collaboration with a third party, New

World Nutritionals, constitutes a misappropriation of Plaintiffs' trade secrets relating to the formulation of Plaintiffs' wellness products.   Defendants submit, among other things, that Plaintiffs cannot prove the misappropriation of their trade secrets because the 2018 written agreement between Defendants and New World Nutritionals obligated the parties to maintain the confidentiality of Plaintiffs' trade secrets.   [D.E. 73 at 85-86].   Plaintiffs respond that the evidentiary value of this 2018 agreement is specious, highlighting that the agreement expressly references Lunamar even though Lunamar did not exist until 2020.  *See id*. at 85.

The record on summary judgment supports Plaintiff's theory that Defendants clandestinely entered into a contract with manufacturer New World Nutritionals without Plaintiffs' knowledge or consent.   And through that agreement Defendants provided confidential formulas of Plaintiffs' products to New World Nutritionals that compromised the integrity and ownership of the Plaintiffs' products.   This record evidence would support a claim for misappropriation of trade secrets.  See, e.g., *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1273 (11th Cir. 2021) ("a plaintiff must show that '(1) it possessed a 'trade secret' and (2) the secret was misappropriated.'") (misappropriation occurs "when a trade secret is acquired 'by someone who knows or has reason to know that the secret was improperly obtained or who used improper means to obtain it.'").

Defendants are thus seeking summary judgment, not on the merits of the prima facie case (i.e. that Plaintiffs possessed a trade secret that Defendants then disclosed to a third party), but instead on defenses that they may have to either

28

willfulness (for punitive damage purposes) or damages.  Defendants may argue to the trier of fact that any disclosure to the third party was subject to confidentiality restrictions that negated any damages to Plaintiffs.  In other words, Defendants' handling of the confidential information prevented Plaintiffs from suffering any actual losses from the misappropriation.

But for summary judgment purposes, the record amply supports a viable claim for misappropriation of trade secrets, which claim the trier of fact must consider in determining if any damages are due.  Because Plaintiffs' trade secrets claims are in this manner heavily disputed, the claims are not amenable to resolution on summary judgment.  Accordingly, insofar as Defendants' motion relates to the trade secrets claims, the motion should be DENIED.

### 7.   *Defendants are entitled to summary judgment on Plaintiffs' civil conspiracy claim.*

Defendants' next argument is similar to the one they utilized to attack Plaintiffs' tortious interference claims.  They submit that Plaintiffs' civil conspiracy claim fails because it is barred by the intra-corporate conspiracy doctrine, which holds that a corporation cannot conspire with its agents because a corporation and its agents constitute only one legal actor.  *See McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

Plaintiffs respond to this by citing an exception to the intra-corporate conspiracy doctrine.   Under Florida law, if an agent of a corporation has an independent personal stake in achieving the object of the conspiracy, then the intra-corporate conspiracy doctrine does not bar a claim for civil conspiracy.  *Hackett v.*

*Metro. Gen. Hosp.*, 422 So. 2d 986, 988 (Fla. 3d DCA 1982); *Orange Lake Country Club, Inc. v. Reed Hein & Assoc., LLC*, 367 F. Supp. 3d 1360, 1372-73 (M.D. Fla. 2019). Accordingly, Plaintiffs argue that Mr. Diaz was acting to advance his personal interests when he sought to tortiously harm Plaintiffs—specifically, in Plaintiffs' view, Mr. Diaz sought to advance his own personal wealth as well as the wealth of his other companies and his other business associates. Therefore, goes Plaintiffs' argument, when Mr. Diaz conspired with DWTG to harm Plaintiffs, Mr. Diaz was acting not as an agent of DWTG but rather as Mr. Diaz (the individual) or Mr. Diaz (the agent of a company other than DWTG).

Again, however, Plaintiffs fail to meet their burden of production at this juncture because they do not cite any tangible evidence to support their argument that Diaz was acting entirely in for his own self-interest in response to Defendants' motion for summary judgment. Nor do they cite any authorities that support an owner and CEO of a company being capable of conspiring with the company itself in the manner alleged here. To the contrary, the well-established general rule would firmly apply to a CEO and owner of a company because his actions are demonstrably tied to the company's actions. *See, e.g., Apex Toxicology, LLC v. United HealthCare Services, Inc.*, 17-61840-CIV, 2020 WL 13551299, at *8 (S.D. Fla. July 7, 2020) ("to the extent United's civil conspiracy claim is based on Apex and its owners and affiliates' scheme to defraud commercial insurers, the claim fails by application of the intracorporate conspiracy doctrine and must be dismissed.").

Accordingly, insofar as Defendants' motion relates to the civil conspiracy claim set forth in Count XV the motion should be GRANTED.

### 8.   *Defendants are entitled to summary judgment on Plaintiffs' fraud claim.*

Defendants' final attack on Plaintiffs' case relates to the fraud claim in Count XIII levied against both DWTG and Mr. Diaz.  Defendants submit that this claim is barred by the independent tort doctrine and otherwise fails due to a lack of evidence.

Florida law precludes tort claims that are not independent of a breach of contract claim.  *See, e.g., Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 408 (Fla. 2013) (Pariente, J. concurring); *Lamm v. State Street Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014).

Plaintiffs do not dispute that their alleged torts must be distinct from their breach of contract claims.  Instead, relying largely on a lobster tale, they try to meet their burden and explain why their fraud claim is independent from their breach of contract claim. *See Yukon Corp. v. Gedcore*, No. 22-cv-20661, 2022 WL 3701233, at *3 (S.D. Fla. June 21, 2022).   Plaintiffs highlight *Yukon Corp.* as an example for how misrepresentations designed to fraudulently induce a counterparty into a contract can cause independent tort damage.

In *Yukon Corp.*, the parties contracted for the purchase of frozen lobster tails after the defendants represented that they had sufficient inventory to fulfill the plaintiff's lobster tail order.  *Id.* at *1.  The plaintiff paid a $150,000.00 deposit for the lobster tail; however, the crustaceans never arrived and therefore, after failing to receive a refund, the plaintiff sued the defendants for breach of contract *and* fraud in

31

the inducement under Florida law. *Id*. at *1-2. Judge Altonaga ruled that the independent tort doctrine did not bar the fraud claim because the "heart" of the parties' agreement was for the fulfillment of a lobster tail order and therefore "representing that someone *will* fulfill an order is not the same as representing that it *presently* can do so from its own inventory." *Id*. at *6 (emphasis in original). Thus, a misrepresentation about the defendants' inventory was a tort that was independent from the contract and therefore would be actionable as fraud (but for the failure to allege damages separate from the breach of contract claim). *Id*.

The distinction with that case, however, is readily apparent. "Unlike fraud in the inducement, *fraud in the performance* cannot give rise to an 'independent cause of action in tort.'" *Id*. at *5 (quoting *La Pesa Grande Charters, Inc. v. Moran*, 704 So. 2d 710, 712 (Fla. 5th DCA 1998) (emphasis added). A review of the operative complaint reveals that Defendants' allegedly fraudulent misrepresentations and omissions—i.e., the conduct constituting the heart of the fraud claim—are an almost verbatim replication of Plaintiffs' breach of contract claim. *Compare* [D.E. 73 at ¶ 121] *with* [D.E. 73 at ¶ 173]. Plaintiffs are not, however, focusing on specific statements of fact made prior to the parties' licensing agreements that were relied upon in order to enter into them in the first place.

Instead, Plaintiffs make a variety of allegations regarding what Defendants did (or didn't do) that amounted to fraud in their eyes—all of which amount to fraud in the performance of the parties' contractual obligations. Indeed, the only evidentiary citation in support of their fraud claim against Defendants is Ms.

Molina's deposition wherein she discusses her first impression of Defendants in general terms. *See* [D.E. 139-1 at 63-66]. Beyond that, Plaintiffs merely speculate about Mr. Diaz's intentions—but speculation is not evidence from which a reasonable jury could find in Plaintiffs' favor.

Ms. Molina recounted in her deposition how Defendants initially led her to believe that DWTG manufactured its products in Colombia, and this was an important detail in Ms. Molina's view because she wanted to be in business with a manufacturer and, moreover, she wanted her products to be manufactured in Colombia (as opposed to China, for example) because she perceives Colombian products to be of superior quality to goods originating elsewhere. *See id.* Mr. Diaz's testimony, by contrast, indicates that DWTG's operations made it a reseller rather than a manufacturer because, even though the products were made in Colombia, it was Mr. Diaz's mother's Colombian company that manufactured some of the products that DWTG distributed for Plaintiffs. *See, e.g.,* [D.E. 141-8 at 65, 176].

But this distinction between *manufacturer* and *reseller* is materially irrelevant because the contract that DWTG and MCM entered in 2015 expressly permitted DWTG to "manufacture or have manufactured on its behalf" the licensed products contemplated by the agreement. [D.E. 141-7 at 4]. And this agreement includes an integration clause—a statement that the written contract comprises the *entire* agreement between the parties. *Id.* at 16-17. So, even though Ms. Molina may have initially wanted to do business directly with a manufacturer, her company ultimately

contracted with an entity that was expressly authorized to have goods manufactured on its behalf.

Moreover, putting aside that *Yukon Corp.* is distinguishable both factually and procedurally, Plaintiffs do not allege that this distinction between manufacturer and reseller constituted the alleged fraud.  By contrast, Plaintiffs' fraud allegations center around Defendants' performance under the relevant contracts.  Specifically, despite their contractual obligations they claimed to others that they had rights in Plaintiffs' marks; they engaged in alternate agreements with others; they sold the same products through other lines or entities; they failed to make payments as required by the agreements; they purchased a domain name using Claudia Molina's brand without consent from Ms. Molina; etc. [D.E. 73 ¶173].  These are all "frauds" committed in the course of compliance (or breach) of the parties' contractual relationship.  They are thus *not* independent of the breach of contract claims in the case.  A fraud action here simply does not lie.  *See Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 77-78 (Fla. 3d DCA 1997) ("A critical distinction [to the general rule that fraudulent inducement claims are independent torts] must be made where the alleged fraudulent misrepresentations are inseparably embodied in the parties' subsequent agreement. . . . [W]here the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label of 'fraudulent inducement' to a cause of action will not suffice to subvert the sound policy rationales underlying the independent tort doctrine."); *Monsoon, Inc. v. Bizjet Int'l Sales & Support, Inc.*, No. 16-80722-CIV, 2017 WL 747555, at *10 (S.D. Fla. Feb. 27, 2017)

("Regardless of when the alleged misrepresentations were made, the question that must be answered is whether the representations at issue concern the heart of the parties' agreement." (citations omitted)); *Certified Collectibles Grp., LLC v. Globant, LLC*, No. 8:19-CV-1962-SDM-AEP, 2021 WL 1214963, at *4 (M.D. Fla. Mar. 31, 2021) ("Although fraudulent inducement can qualify as an independent tort, the critical inquiry focuses on whether the alleged fraud is separate from the performance of [a] contract. An alleged fraud is not separate from the performance of the contract [if] the misrepresentations forming the basis for the fraud also form the basis for the breach of contract claim." (internal quotation marks and citations omitted)).

Having reached "the critical put up or shut up moment" of the case, *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 878 (7th Cir. 2021), we are persuaded that Plaintiffs have failed to muster enough evidence to create a genuine dispute of material fact regarding whether Defendants have committed a fraud that is independent of their alleged contractual breaches. Accordingly, insofar as Defendants' motion relates to the fraud claim set forth in Count XIII, the motion should be GRANTED.

### B. *Plaintiffs' motion for partial summary judgment.*

We turn now to Plaintiffs' motion for summary judgment. Plaintiffs' seek affirmative summary judgment in their favor on certain aspects of their claims in the Amended Complaint. Defendants oppose the motion arguing chiefly that fact issues abound on those claims thus making summary judgment improper.

### A.      Plaintiffs' Breach of Contract Claim in Count VI

Plaintiffs first seek relief on Count VI of their amended complaint, which alleges a variety of ways in which Defendants breached the licensing agreement that MCM and DWTG signed in 2018.  *See* [D.E. 73 at 23-25].  To prevail in a breach of contract action in Florida, one must prove (1) the existence of a valid contract, (2) a material breach of that contract, and (3) damages flowing from the breach.  *See, e.g., Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. 3d DCA 2017).  Here, a review of the record demonstrates that disputes of material fact surround Plaintiffs' amalgam of breach theories.

For example, there is a factual dispute regarding whether Valeria Sandoval— a non-party—qualifies as a "celebrity" under the terms of the 2018 licensing agreement; but even assuming that she is a celebrity, there still exists a temporal dispute regarding whether the alleged "Somos Parceros" collaboration, which connects Defendants to Ms. Sandoval, predated the non-compete clause in the 2018 licensing agreement.  Accordingly, Plaintiffs' motion for summary judgment on their breach of contract claim found in Count VI of the Amended Complaint should be DENIED.

### 2.      *Defendants' defenses founded on the existence of an implied entity are legally flawed and due for summary judgment.*

Defendants have alleged (and seek leave to re-allege) that, since 2015, the parties have been in an implied partnership or an implied joint venture in accordance with Florida law.  *See, e.g.,* [D.E. 191-1 at 11-13].  This implied entity serves as the

foundation for many of Defendants' counterclaims and defenses.[29]  But the problem with Defendants' implied-entity theory is that, as a matter of law, the alleged implied entity *cannot exist* in compliance with Florida's statute of frauds.

Contrary to Defendants' peculiar misstatement of Florida law,[30] it is well-established that "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement . . . shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized."  Fla. Stat. § 725.01; *see also, e.g., Tanenbaum v. Biscayne Osteopathic Hosp., Inc.*, 190 So. 2d 777, 779 (Fla. 1966) ("The statute of frauds grew out of a purpose to intercept the frequency and success of actions based on nothing more than loose verbal statements or mere innuendos. To accomplish this, the statute requires that all actions based on

---

[29]    Defenses 1, 2, 4, 5, 7, 12, and 16 rely, entirely or in part, on the existence of this alleged implied entity. *See* [D.E. 74]. Defendants' proposed Affirmative Defenses 2, 3, 4, and 10 similarly rely, entirely or in part, on the existence of this alleged implied entity. *See* [D.E. 191-2]. Counterclaims 1, 2, 3, 4, 5, 6, 7, and 8 relied, entirely or in part, on the existence of this implied entity. *See* [D.E. 84].  And *all* of Defendants' proposed Counterclaims expressly rely on the existence of this alleged implied entity. *See* [D.E. 191-1].

[30]    In their response to Plaintiffs' motion for summary judgment, Defendants maintain that Florida's statute of frauds "cannot apply" to "*implied* partnerships and joint ventures" because such agreements do not need to be reduced to a writing to be enforceable.  [D.E. 146 at 5] (emphasis in original).  Defense counsel then cites one case for this proposition, which lends no direct support. *See WL Alliance LLC v. Precision Testing Grp.*, No. 19-cv-04459, at *2 (N.D. Fla. Oct. 19, 2021).  This proposition lacks any credibility.  It is a basic principle of law, which is defined in the plain language of the Florida Statutes, that any agreement—including a partnership and/or joint venture agreement—must be reduced to writing (and signed by the party to be charged) to be enforceable if performance under the agreement cannot be completed within one year. *See* Fla. Stat. § 725.01.

agreements for longer than one year must depend on a written statement or memorandum, signed by the party to be charged."); *Browning v. Poirier*, 165 So. 3d 663, 666 (Fla. 2015) ("[J]udging from the time the oral contract of indefinite duration is made, if the contract's full performance is possible within one year from the inception of the contract, then it falls outside the statute of frauds."). So, let us consider the written and signed documents in the record.

Here, it is undisputed that the parties' business relationship began in 2015 with a written licensing agreement between MCM and DWTG that, for our purposes, included four important provisions. [D.E. 141-7]. First, the agreement contemplated a performance duration of 30 months—i.e., more than one year. *Id.* at 1. Second, the agreement disclaimed an equal sharing of profits and losses in exchange for a royalty payment scheme. *Id.* at 5-6. Third, the agreement expressly denied that the parties were agents of one another. *Id.* at 13. And fourth, the agreement contained an integration clause—i.e., a statement that it constituted the entire agreement between the parties—and we cannot reasonably glean the creation of a partnership or joint venture from any corner of this document. *Id.* at 16-17.

Therefore, not only does the performance term of the agreement illustrate that any partnership or joint venture agreement between the parties that stemmed from this business relationship needed to be reduced to a writing to satisfy the statute of frauds, but the content of the agreement itself runs counter to what Florida law requires to create an implied partnership and/or an implied joint venture. For example, both an implied partnership and an implied joint venture require proof that

the parties to the agreement held a right to share in the profits of the enterprise and a duty to share in any losses that might be sustained.  *See, e.g., Kislak v. Kreedian*, 95 So. 2d 510, 515 (Fla. 1957) (defining the elements of an implied joint venture); *Munro v. Futch*, No. 06-cv-21108, 2007 WL 9702306, at \*3 n. 4 (S.D. Fla. Feb. 27, 2007) ("Under Florida law, an implied partnership exists only where "both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business.") (citing *Williams v. Obstfeld*, 314 F.3d 1270, 1275-76 (11th Cir. 2002)). Here, the first licensing agreement adopts a royalty payment plan in lieu of a right to share in profits and a duty to share in losses.

The record further reflects other written agreements between MCM and DWTG are not evidence of either an implied partnership or an implied joint venture. The parties' second license agreement from 2018 is substantially similar to their 2015 agreement, again specifying a 30-month performance term.  [D.E. 73 at 62].  It also adopts a royalty scheme instead of prescribing a mutuality of interests in both profits and losses.  *Id.* at 6.

And their third and fourth licensing agreements similarly disprove the existence of an implied partnership or an implied joint venture that complies with the statute of frauds because they respectively contemplate performance terms of 25 months and 13 months.  [D.E. 141-11 at 1]; [D.E. 141-12 at 1].  The fourth licensing agreement adopts a royalty scheme similar to the first and second licensing agreements.  [D.E. 141-12 at 1].  And although the third licensing agreement adopts

a 50/50 split for profits and losses, it is, by definition, a *licensing* agreement—not a partnership or joint venture agreement—with an integration clause. [D.E. 141-11 at 1]. Moreover, the third licensing agreement does not grant MCM joint control (or the right of control) over the entire operation; certain activities such as distribution and customer service are the exclusive domain of DWTG. *Id.*; *see also Kislak*, 95 So. 2d at 515 (holding that "joint control or right of control" is an element of an implied joint venture).

As matter of law, the parties were never in an implied partnership or an implied joint venture. To meet their burden, Defendants need to produce evidence that satisfies the statute of frauds in order to raise a genuine dispute regarding whether an implied entity existed between the parties. They have not done this. To the contrary, the record evidence points in the opposite direction.

If the counterclaims had not already been dismissed, we believe Plaintiffs would also be entitled to summary judgment on the counterclaims that rely on Defendants' implied entity theory because the "entity" alleged by Defendants cannot exist under Florida law. But the counterclaims have been dismissed, and so it suffices to say at this juncture that permitting Defendants to file their amended counterclaims—all six of which rely on the existence of Defendants' alleged implied entity—would be futile. The same holds true with previously stricken defenses that Defendants seek leave to re-allege at the eleventh hour.

With that said, some of Defendants' asserted defenses that have not already been stricken do rely on this implied entity theory. Accordingly, Plaintiffs' motion for partial summary judgment with regard to Defense 12 should be GRANTED.

### 3. Plaintiffs are entitled to summary judgment on one of Defendants' ratification defenses, but not the other.

Defendants pled two ratification defenses—Defenses 2 and 3. *See* [D.E. 74 at 14]. Defense 2 alleges that, with respect to Defendants' contractual relationship with New World Nutritionals, Plaintiffs ratified that contract and are therefore not entitled to damages from Defendants' alleged breach. *Id.* Defense 3 also alleges a defense pursuant to the doctrine of ratification, however, it offers no factual context regarding which of Defendants' alleged breaches were ratified by Plaintiffs. *Id.* Plaintiffs have moved for summary judgment on both ratification defenses.

We find that a genuine dispute of material fact exists regarding whether Plaintiffs' ratified Defendants' alleged breach involving New World Nutritionals, and therefore summary judgment should be DENIED on Defense 2. For example, Defendants point to emails from 2021 and 2022 that include Mr. Diaz, Ms. Molina, and the principal behind New World Nutritionals wherein it appears that the parties continued to collaborate with New World Nutritionals on a line of protein supplements despite Mr. Diaz's allegedly premature (and therefore wrongful) discussions with the protein supplier. *See* [D.E. 139-10]. Defendants also point to Ms. Molina's deposition testimony wherein she recounts her collaboration with New World Nutritionals after Defendants' alleged breach. *See* [D.E. 139-9 at 95-96]. It is therefore possible, in our view, for a reasonable jury to conclude from the record

before us that Plaintiffs learned on Defendants' alleged breach and nevertheless decided to collaborate with Defendants' identified protein supplier. Accordingly, Defense 2 is not amenable to resolution on this juncture.

But Defendants neglect to respond to Plaintiffs' motion attacking Defense 3, failing to provide even a scintilla of factual context for this alleged defense. We can glean no facts from the record that would prove Plaintiffs' ratification of Defendants' other alleged breaches. And without Defendants' guidance regarding which alleged breaches—beyond the New World Nutritionals collaboration—this defense relates to, the Court is especially reluctant to articulate hypothetical ratification theories on Defendants' behalf. Accordingly, summary judgment should be GRANTED on Defense 3 in Plaintiffs' favor because Defendants' failure to respond to Plaintiffs' argument mandates the entry of summary judgment for Plaintiff. *See, e.g., Floyd v. Home Depot U.S.A., Inc.*, 274 F. App'x 763, 765 (11th Cir. 2008); *Edmondson v. Board of Trustees of the University of Alabama*, 258 F. App'x 250, 253 (11th Cir. 253) ("In opposing a motion for summary judgment, a party may not rely on her pleadings to avoid judgment against her. There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). In other words, Defendants have abandoned Defense 3 and therefore Plaintiffs are entitled to summary judgment on that defense.

### 4.    Summary judgment is due on Defendants' laches defense.

Plaintiffs next argument takes aim at Defense 5, which alleges that Plaintiffs' trademark claims—which were brought in 2022 when this lawsuit was filed—are barred by the doctrine of laches because Plaintiffs unreasonably delayed their efforts to enforce their trademark rights.  This laches defense fails as a matter of law.

The equitable doctrine of laches should be applied flexibly, provided that the defendant can demonstrate (1) a delay in asserting a right or claim, (2) the inexcusable nature of that delay, and (3) the existence of undue prejudice against whom the claim is asserted.  *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1005 (11th Cir. 2021).  "In trademark infringement cases, because the Lanham Act does not contain a statute of limitations, we consider the 'the [limitations] period for analogous state law claims as the touchstone for laches.'"  *Id*.  "The analogous Florida limitations period for this type of action is four years."  *Id*. (citing Fla. Stat. § 95.11(3)).

Here, Defendants do not dispute that Plaintiffs filed suit against them soon after Plaintiffs allegedly discovered that Defendants were selling Plaintiffs' shapewear under a different brand; Defendants dispute only whether the underlying conduct infringed Plaintiffs' trademarks (or otherwise breached the parties' agreements).  Indeed, Defendants proffer no factual evidence whatsoever bearing upon the duration of time between when Plaintiffs learned of the offensive conduct and when Plaintiffs filed suit to correct the injustice.  Because the undisputed record reflects that this lawsuit was filed well within Florida's four-year statute of

limitations for trademark infringement cases, we find that Defendants cannot prove the "delay" element of their laches defense as a matter of law. Accordingly, on Defense 5, summary judgment should be GRANTED in Plaintiffs' favor.

### 5. *Plaintiffs have abandoned their trademark infringement theory based on the "PELAZO" mark, mooting their motion for summary judgment on Defenses 8 and 15.*

Defendants allege two defenses that are designed to avoid liability on Plaintiffs' trademark infringement claims insofar as those claims are premised on Plaintiffs' "PELAZO" trademark. *See* [D.E. 74 at 15-16]. Defenses 8 and 15 essentially allege that Defendants have superior rights to the PELAZO trademark, which in theory undermines Plaintiffs' ability to successfully maintain a trademark infringement claim that is premised on the PELAZO mark.

Contrary to the operative complaint, which alleges that "PELAZO" is among the "Marks" that Defendants have infringed, Plaintiffs now affirmatively represent that they are *not* suing Defendants for infringing the PELAZO mark. *See* [D.E. 73 at ¶¶ 16, 74-82]; [D.E. 138 at 24] ("Plaintiffs are not asserting their rights in the PELAZO mark against Defendants."); *see also* [D.E. 147 at 8-10] (declining to discuss the PELAZO mark in response to Defendants' motion for summary judgment on Plaintiffs' trademark infringement claim). Accordingly, Plaintiffs have abandoned their trademark infringement claim premised on the PELAZO mark. *See, e.g., Resolution Trust Corp.*, 43 F.3d at 599 ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *B&D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC,* 748 F. App'x 785, 790 (11th Cir.

2018) (same); *Tolliver v. City of Montgomery*, No. 04-cv-01185, 2005 WL 3543185, at *1 (M.D. Ala. Dec. 27, 2005) (granting summary judgment in favor of the defendants after the plaintiff expressly abandoned his discrimination claims in his summary judgment briefing).

Because Plaintiffs have abandoned their trademark infringement claim insofar as it is premised on the PELAZO mark, Plaintiffs have effectively rendered their motion for summary judgment regarding Defendants' PELAZO-based defenses moot. Accordingly, insofar as Plaintiffs' motion for summary judgment relates to Defenses 8 and 15, it should be DENIED as moot.

And because Defendants are *not* being sued for infringing the PELAZO mark, Defendants' alleged status as a senior user of the PELAZO mark and Plaintiffs' alleged commission of fraud on the USPTO with respect to their registration of the PELAZO mark are irrelevant. Accordingly, and in light of the fact that the time has come to streamline the pleadings for trial, the Court should exercise its discretion under Rule 12(f) and thereby STRIKE these PELAZO-based defenses as "immaterial."

### 6.   *Defense 14 survives summary judgment*.

Finally, Plaintiffs move for summary judgment on Defendants' "innocence" defense, which alleges that Defendants' infringement of Plaintiffs' trademarks, if any, was innocent. Plaintiffs correctly note that trademark infringement is a strict liability offense. *See, e.g., River Light V, L.P. v. Tanaka*, No. 17-cv-22843, 2018 WL 5778234, at *7 (S.D. Fla. Nov. 2, 2018). But Plaintiffs err in concluding that the

concept of innocent infringement is wholly irrelevant to their trademark infringement claims because "innocence" can impact the trademark holder's available remedies.  In other words, innocence is not a defense to liability but can be a partial defense to damages.  *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1252, 1263 (S.D. Fla. 2002).  Plaintiffs' argument here, which appears to be a motion to strike masquerading as a motion for summary judgment, fails as a matter of law.  This final aspect of Plaintiffs' motion for summary judgment should be DENIED.

### C.   *Defendants' motion for leave to amend their pleadings.*

Trial is scheduled to commence in only a few months.  A review of the procedural history reveals that this case began in September 2022 when Plaintiffs sued Defendants for various harms arising from the parties' licensing agreements.  Defendants responded to the complaint in October 2022, lodging a panoply of counterclaims and affirmative defenses in the process.  Those counterclaims and affirmative defenses were then subject to a round of Rule 12 litigation, which ultimately resulted the filing of an amended complaint as well as an amended answer, affirmative defenses, and counterclaims.[31]

Defendants filed their amended pleadings in June 2023 after several months of litigating various discovery issues.  Plaintiffs again sought to dismiss Defendants' counterclaims and strike several of their affirmative defenses.  And while those

---

[31]   On May 5, 2023, the deadline fixed for all motions seeking to amend the pleadings in this case, Plaintiffs moved to amend their complaint.  Judge Gayles subsequently permitted the parties to file amended pleadings.

motions were pending resolution, the parties continued to engage in discovery that was tied to the substance of the amended pleadings.[32]  Each side also filed a motion for partial summary judgment, which we discussed in detail above.  Discovery closed on December 19, 2023.

The Court subsequently recommended that all of Defendants' counterclaims be dismissed and that six of Defendants' affirmative defenses be stricken as well. This recommendation was adopted, and Defendants' motion for leave to amend their pleadings followed.

Because Defendants moved to amend their pleadings ten months after the deadline for such motions, the motion is not governed by the relaxed Rule 15(a)(2), which requires leave to be "freely give[n]" when justice so requires.  By contrast, Rule 16(b)(4) governs because Defendants' motion necessitates a modification of the scheduling order—otherwise, Defendants' motion would be deemed an untimely violation of the scheduling order.  Rule 16(b)(4) provides that a scheduling order may be modified only if the Court finds "good cause" for such a modification.  Here, we do not find "good cause" to modify the scheduling order for three reasons.

First, trial in this case is scheduled to commence in approximately three months.  Defendants offer no explanation regarding how amending their pleadings at this juncture would not imperil the trial date.  Indeed, Defendants' motion ignores

---

[32]    The discovery window in this case was repeatedly enlarged.  The discovery cutoff was initially set for June 13, 2023.  That deadline was later pushed to August 11, 2023.  The deadline was extended again to November 1, 2023.  Ultimately, the Court delayed the discovery cutoff to December 19, 2023—more than a full year after this case was instigated and more than six months after the original discovery cutoff.

Rule 16(b)(4)'s good cause standard entirely.  We must therefore assume that granting leave to amend Defendants' pleadings at this late stage of the case will necessarily delay the trial date *again*.  On this record, which is rife with delay, we are not persuaded that another delay is warranted or appropriate.  By contrast, it is almost time to call the first witnesses.

Second, discovery has been closed for months and summary judgment motions have already been litigated.  The parties' discovery strategies and their summary judgment motions, which rely in part on the evidence derived through discovery, were premised on the amended pleadings that were filed last summer.  Defendants' proposed amended pleadings are problematic because, in addition to recycling much of the substance from their prior pleadings, Defendants inject a few new facts and theories of defense into this case at the eleventh hour.  In our view, it is far too late in the game to introduce factual allegations that were not articulated prior to April 2024.  *See, e.g., Lowe's Home Centers, Inc. v. Olin Corp.*, 313 F.3d 1307, 1315 (11th Cir. 2002) ("[I]t is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments and past the deadline for filing dispositive motions."); *Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999) ("Prejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided."); *Pringle v. Johnson & Johnson*, No. 13-cv-81022, 2019 WL 9654850, at *6 (S.D. Fla. Nov. 6, 2019) (denying a motion to amend the

complaint because the plaintiff failed to demonstrate "good cause" for a modification of the scheduling order).

Third, our review of the proposed amendments indicate that amendment would be futile to a large degree because Defendants repeat many of the errors that caused their counterclaims to be dismissed and some of their affirmative defenses to be stricken. Again, for example, Defendants list affirmative defenses that are nothing more than redundant denials of Plaintiffs' allegations: Defendants' proposed second, third, and tenth affirmative defenses essentially reiterate that Plaintiffs' trademark infringement claims fail because they do not have a cognizable interest in the marks at issue. These affirmative defenses have already been stricken because they are not affirmative defenses, but Defendants nevertheless recycle them in their proposed amended pleadings despite the Court's admonition to avoid redundant denials. Separately, Defendants' proposed counterclaims rely on the existence of an implied partnership (or joint venture) that has allegedly existed since 2015. As we discussed above, it is legally untenable for Defendants to maintain that the parties have been in an implied partnership or joint venture since 2015 because this allegation runs afoul of Florida's statute of frauds and contra to the written agreements entered into by the parties.

In sum, we do not find that "good cause" exists to grant Defendants leave to amend their counterclaims and affirmative defenses. Holding otherwise would unduly prejudice Plaintiffs and necessitate further delay of the trial. Defendants' motion for leave should be DENIED.

### III.    CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment should be **GRANTED in part and DENIED in part**, Plaintiffs' motion for partial summary judgment should be **GRANTED in part and DENIED in part**, and Defendants' motion for leave to amend its pleadings should be **DENIED**. Accordingly, the claims that should survive Rule 12 *and* Rule 56 motion practice are recited below:

#### **Amended Complaint**

COUNT 2:      Unfair Competition under Federal Law.

COUNT 4:      Unfair Competition under Florida Law ("FDUPTA").

COUNT 6:      Breach of Contract under Florida Law.

COUNT 8:      Accounting and Damages under Florida Law.

COUNT 9:      Constructive Trust under Florida Law.

COUNT 10:     Misappropriation of Trade Secrets under Federal Law.

COUNT 11:     Misappropriation of Trade Secrets Under Florida Law.

COUNT 13:     Unjust Enrichment under Florida Law.

COUNT 14:     Permanent Injunction under Federal Law.

COUNT 17:     Breach of the Covenant of Good Faith and Fair Dealing (only against DWTG)

#### **Affirmative Defenses**

DEFENSE 2:    Ratification regarding Defendants' relationship with New World Nutritionals.

DEFENSE 9:    Failure to mitigate damages.

DEFENSE 11: Punitive damages claims are barred by the Lanham Act.

DEFENSE 13: Plaintiffs claims are barred because the relevant trademarks do not meet the requisite standard for fame.

DEFENSE 14: Plaintiffs claims are barred because the alleged infringement was innocent.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 22nd day of May, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
Chief United States Magistrate Judge